No. 20-1537

MILITARY-VETERANS ADVOCACY INC.,

*Petitioner,*

*v.*

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

On Petition for Review Pursuant to 38 U.S.C. § 502

## CORRECTED OPENING BRIEF OF PETITIONER

John B. Wells
MILITARY-VETERANS
ADVOCACY INC.
P.O. Box 5235
Slidell, LA 70469-5235

Melanie R. Hallums
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
2121 Main Street
Wheeling, WV 26003

Jeffrey T. Quilici
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
300 W. 6th Street, Suite 1850
Austin, TX 78701
(512) 582-6950

Melanie L. Bostwick
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005

*Counsel for Petitioner*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 20-1537 |
| **Short Case Caption** | MILITARY-VETERANS ADVOCACY INC. v. SECRETARY OF VETERANS AFFAIRS |
| **Filing Party/Entity** | Petitioner MILITARY-VETERANS ADVOCACY INC. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/15/2021

Signature: /s/ Jeffrey T. Quilici

Name: Jeffrey T. Quilici

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| MILITARY-VETERANS ADVOCACY INC. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASES ...................................................... xi

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 4

STATEMENT OF THE ISSUES .............................................................. 5

STATEMENT OF THE CASE ................................................................. 6

    The United States uses Agent Orange in Vietnam; Congress
        passes laws to help veterans seeking benefits based on
        exposure to Agent Orange ..................................................... 6

    Congress passes the Agent Orange Act to provide service-
        connection status to diseases manifested by veterans
        who served in the Republic of Vietnam during the war ....... 10

    This Court decides Procopio, and Congress enacts the Blue
        Water Navy Vietnam Veterans Act of 2019. ....................... 13

    The VA issues final rules regarding the presumption of
        service connection. ................................................................ 15

    Military-Veterans Advocacy files a petition for review ................ 17

SUMMARY OF ARGUMENT ............................................................... 18

ARGUMENT ....................................................................................... 23

    I.     Standard of Review ........................................................... 23

    II.    MVA Has Associational Standing to Challenge the
         Rules. .............................................................................. 24

    III.   The Airspace Rule Should Be Invalidated as Contrary
         to Governing Law. ............................................................ 29

    IV.   The BWN Rule Should Be Invalidated as Contrary to
         Governing Law. ............................................................... 35

A.    The BWN Rule conflicts with the controlling statutory text in the Agent Orange Act and the BWN Act.................................................... 35

1.    The BWN Rule erroneously restricts the presumption of service connection to veterans who served within the area defined by the BWN Act.............................................. 35

2.    The BWN Rule's restriction of the presumption of service connection conflicts with statute, international law, and this Court's rulings...................................... 37

3.    The BWN Act supplements, rather than supplants, the Agent Orange Act. ...................... 40

B.    The BWN Act also conflicts with VA's regulations implementing the Agent Orange Act............................ 43

V.    The Thailand Rules Should Be Invalidated as Arbitrary and Capricious Because They Do Not Account for Inevitable Exposure to Veterans Outside Their "Duties." ........................................................ 48

A.    Veterans who slept and ate near the perimeter of a base in Thailand were exposed to herbicides but are denied the presumption of exposure. .................... 48

B.    Veterans stationed on the interior of bases would also have been exposed but are denied the presumption of exposure............................................. 53

C.    Although VA promised in 2017 to account for these disparate treatments of veterans, the Thailand Rules correct none of the known flaws. ........................ 56

CONCLUSION ....................................................................... 59

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auer v. Robbins,*
519 U.S. 452 (1997) ............................................................. 13

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ........................................................ 33

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................ 30

*Disabled Am. Veterans v. Sec'y of Veterans Affs.,*
859 F.3d 1072 (Fed. Cir. 2017) ................................... 17, 18

*E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.,*
257 F.3d 1352 (Fed. Cir. 2001) ......................................... 28

*Haas v. Peake,*
525 F.3d 1168 (Fed. Cir. 2008) ......................................... 13

*Hansen-Sorensen v. Wilkie,*
909 F.3d 1379 (Fed. Cir. 2018) .......................... 49, 53, 56

*Holton v. Shinseki,*
557 F.3d 1362 (Fed. Cir. 2009) ........................................... 8

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ........................................ 24, 25, 28, 29

*Int'l Union, United Auto., Aerospace & Agric. Implement
Workers of Am. v. Brock,*
477 U.S. 274 (1986) ............................................................ 28

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.,*
981 F.3d 1360 (Fed. Cir. 2020) ................... 5, 18, 24, 25, 58

*Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.,*
345 F.3d 1334 (Fed. Cir. 2003) ......................................... 23

*Procopio v. Sec'y of Veterans Affs.*,
  943 F.3d 1376 (Fed. Cir. 2019) ........................................ 15

*Procopio v. Wilkie*,
  913 F.3d 1371 (Fed. Cir. 2019) ...... 13, 16, 29, 30, 32, 33, 38, 42, 46, 47

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) ....................................................... 31

*United Food & Com. Workers Union Loc. 751 v. Brown
  Grp., Inc.*,
  517 U.S. 544 (1996) ........................................................... 24

**Statutes & Rules**

5 U.S.C. § 552(a)(1)(D) ......................................................... 5

5 U.S.C. § 706(2) .................................................................. 5

5 U.S.C. § 706(2)(C) ............................................................ 40

38 U.S.C. § 101(16) ............................................................... 7

38 U.S.C. § 502 ..................................................................... 5

38 U.S.C. § 1110 .................................................................. 58

38 U.S.C. § 1116 .......................................................... *passim*

38 U.S.C. § 1116(a) ....................................... 2, 29, 32, 42

38 U.S.C. § 1116(a)(1) ....................................................... 34

38 U.S.C. § 1116(a)(1)(A) ................................................... 34

38 U.S.C. § 1116(a)(1)(B) ................................................... 38

38 U.S.C. § 1116(a)(1)(B)(ii) ............................................. 10

38 U.S.C. § 1116(a)(2) ....................................................... 12

38 U.S.C. § 1116(b)(1) ....................................................... 11

38 U.S.C. § 1116(f)..........................................................................31

38 U.S.C. § 1116A.......................................................................*passim*

38 U.S.C. § 1116A(a) ...................................................................14

38 U.S.C. § 1116A(b) ...................................................................14

38 U.S.C. § 1116A(d) ...............................................14, 40, 41, 42

49 U.S.C. § 40103(a)(1)...............................................................32

Agent Orange Act, Pub. L. No. 102-4, 105 Stat. 11 (1991)...............10, 11

Blue Water Navy Vietnam Veterans Act of 2019, Pub. L. No.
    116-23, 133 Stat. 966 .......................................................14, 15

Veterans' Dioxin and Radiation Exposure Compensation
    Standards Act, Pub. L. No. 98-542, 98 Stat. 2725 (1984) ...............8, 9

Veterans Health Programs Extension and Improvement Act
    of 1979, Pub. L. No. 96-151 § 307, 93 Stat. 1092 ...............7

Fed. Cir. R. 47(a) ...................................................................4

**Other Authorities**

38 C.F.R. § 3.307 ...................................................................16

38 C.F.R. § 3.307(a)(6)...............................................................42

38 C.F.R. § 3.307(a)(6)(i) ...........................................................50

38 C.F.R. § 3.307(a)(6)(iii) ...................................12, 16, 42, 44, 45, 46, 48

38 C.F.R. § 3.309(e) ...................................................................12

38 C.F.R. § 3.311a(a)(1)...............................................9, 10, 43

38 C.F.R. § 3.313 ...............................................................10, 11

38 C.F.R. § 3.313(a) ...........................................................10, 43

137 Cong. Rec. 2345 (Jan. 29, 1991) ...........................................10

137 Cong. Rec. H719-01 (daily ed. Jan. 29, 1991) ................................. 34

56 Fed. Reg. 51,651 (Oct. 15, 1991) ......................................................... 9

69 Fed. Reg. 44,614 (July 27, 2004) ....................................................... 46

73 Fed. Reg. 20,566 (Apr. 16, 2008) ....................................................... 46

*Agent Orange, Actions Needed to Improve Accuracy and
    Communication of Information on Testing and Storage
    Locations*, GAO (Nov. 2018),
    https://www.gao.gov/assets/gao-19-24.pdf ......................................... 50

Convention on International Civil Aviation, T.I.A.S. No.
    1591 (Dec. 7, 1944) ...................................................................... 31, 32

Convention on the Territorial Sea and the Contiguous Zone,
    15 U.S.T. 1606, T.I.A.S. No. 5639 (Apr. 29, 1958) ........................... 38

Exec. Order No. 11,216, Designation of Vietnam and Waters
    Adjacent Thereto as a Combat Zone for the Purposes of
    Section 112 of the Internal Revenue Code of 1954, 30 Fed.
    Reg. 5817 (1965) ................................................................................ 45

Exec. Order No. 11,231, Establishing the Vietnam Service
    Medal, 30 Fed. Reg. 8665 (1965) ....................................................... 45

Geneva Agreements on the Cessation of Hostilities in
    Vietnam, art. 1, July 20, 1954, 935 U.N.T.S. 149 ............................. 38

H.R. Rep. No. 98-592 (1984) ..................................................................... 7

Institute of Medicine, *Veterans and Agent Orange Update
    2008* (2009), http://nap.edu/12662 ...................................................... 8

Institute of Medicine, *Veterans and Agent Orange Update
    2010* (2012), http://nap.edu/13166 ...................................................... 6

*National Sovereignty of Outer Space*, 74 Harv. L. Rev. 1154,
    (1961) ................................................................................................. 32

VA Adjudication Procedures Manual M21-1 § 4.08(k)(1)
(Nov. 8, 1991) .............................................................. 11, 44

Adm. E.R. Zumwalt, Jr., *Report to the Secretary of the
Department of Veterans Affairs*, reprinted in *Links
Between Agent Orange, Herbicides, and Rare Diseases:
Hr'g Before the Hum. Res. & Intergovernmental Rels.
Subcomm. of the Comm. on Gov't Operations*, 101st Cong.,
2d Sess. 23-24 (1990) ..................................................... 6, 7

## STATEMENT OF RELATED CASES

No appeal originating from the same Department of Veterans Affairs final rules was previously before this or any other appellate court.

The following case may directly affect or be directly affected by this Court's decision in the pending appeal: *National Organization of Veterans Advocates v. Secretary of Veterans Affairs*, No. 20-1321.  This case has been designated a companion case with this other challenge. *See* Dkt. 10.

**INTRODUCTION**

During the Vietnam War, the United States called millions of Americans to military service.  And they answered.  For more than a decade, American soldiers manned bases across Southeast Asia, including in Vietnam and Thailand.  American sailors patrolled the waters off Vietnamese shores, and American airmen flew sorties over the Vietnamese mainland and the surrounding seas.  Some of these Americans were killed.  Others were wounded.  And some were damaged in ways not so easy to detect.  They returned home to their peaceful lives with nascent cancers and other diseases linked to exposure to herbicides such as Agent Orange, the infamous defoliant deployed in bulk during the war.

When their illnesses finally manifested—years or decades later— these veterans turned to the disability benefits that Congress created to reward their faithful service.  But they faced a difficult, and perhaps insurmountable, problem.  Due to scientific uncertainty, incomplete records of herbicide deployments, and the simple passage of many intervening years, it was difficult for many of these afflicted veterans to prove that their illnesses could be traced to their service in the war.

Recognizing this injustice, Congress passed the Agent Orange Act in 1991.  The Act provides that veterans of the Vietnam War suffering from certain diseases associated with herbicide exposure need not prove their disability is linked to their service.  Instead, "military, naval, or air service" veterans alike may rely on a presumption that their disabilities are service connected so long as they "served in the Republic of Vietnam" during the thirteen years of the war.  38 U.S.C. § 1116(a).  The government has extended the same presumption to veterans serving in the "waters offshore" Vietnam and at bases in Thailand in support of the War.  These presumptions enable veterans disabled in the line of duty to receive the critical benefits that Congress has always intended to provide to them on behalf of a grateful nation.

But in practice, not all veterans entitled to these presumptions receive them.  The Secretary of Veterans Affairs has denied the presumptions to many veteran aircrews that flew over Vietnam without landing on Vietnamese soil.  The Secretary's rules similarly deny the presumptions to many blue-water navy veterans who served in ships in the offshore waters and portions of the Vietnamese territorial sea, as well as to veterans whose official duties lay in the interior, rather than

on the perimeter, of their bases in Thailand. The Secretary enshrined these unjustifiable rules and interpretations in the agency's M21-1 Manual, which binds the front-line adjudicators who decide the vast majority of veterans' benefits cases.

The Secretary's erroneous interpretations must fall. Basic tools of statutory interpretation, not to mention this Court's controlling cases, dictate that "service in the Republic of Vietnam" must include service in the air above the Republic and in the seas around it. The Secretary's own contemporaneous regulations similarly demonstrate that navy veterans throughout the theater of conflict are entitled to the same presumption. Nor can the Secretary justify the arbitrary denial of the presumptions to veterans who ate, slept, or traveled off-duty near the herbicide spray zones at the perimeter of military bases, when the presumption is granted to those who worked in the same areas.

Congress established a presumption of exposure to herbicides and service connection, and it meant that presumption to be available to *all* veterans who served in the Vietnamese theater of conflict. The Secretary cannot pick and choose among them. This Court should reject

the Secretary's improper exclusions and strike down the sections of the VA's adjudication manual that implement them.

## JURISDICTIONAL STATEMENT

On December 31, 2019, the Department of Veterans Affairs (VA) issued revisions to Sections IV.ii.2.C and IV.ii.1.H of its M21-1 Adjudication Procedures Manual ("M21-1 Manual"). Specifically, VA modified:

- Section IV.ii.2.C.3.e of the M21-1 Manual, which excludes veterans who flew missions in Vietnamese airspace from the presumption of service connection (the "Airspace Rule");

- Section IV.ii.1.H.1 of the M21-1 Manual, which limits VA's concession of service connection extended to Blue Water Navy veterans to those that served within the area defined by Pub. L. No. 116-23 (the "BWN Rule"); and

- Sections IV.ii.1.H.4.a and IV.ii.1.H.4.b of the M21-1 Manual, which together limit VA's "special consideration" and concession of service connection to those who served on military bases in Thailand to those "whose duties placed them on or near the perimeters of Thailand military bases" (the "Thailand Rules").

On February 18, 2020, Petitioner Military-Veterans Advocacy, Inc. ("MVA") timely petitioned for pre-enforcement review of the rules, policies, and/or interpretations listed above. Dkt. 1; *see* Fed. Cir. R. 47(a). This Court has jurisdiction to review substantive rules of general applicability, statements of general policy, and interpretations of

general applicability promulgated by VA, even where VA has published its rules, policies, and interpretations through its M21-1 Manual rather than through the Federal Register.  38 U.S.C. § 502; 5 U.S.C. § 552(a)(1)(D); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1374-78 (Fed. Cir. 2020) (en banc) (*NOVA*).

Furthermore, MVA has associational standing to bring a pre-enforcement challenge to these rules, as shown below.  *See infra* 24-28.

## STATEMENT OF THE ISSUES

1.     Whether VA's revision to Section IV.ii.2.C.3.e of the M21-1 Manual—which excludes veterans who flew missions in Vietnamese airspace from the presumption of service connection—should be held unlawful and set aside.

2.     Whether VA's revision to Section IV.ii.1.H.1.g of the M21-1 Manual—which limits VA's concession of service connection extended to blue water navy veterans to those that served within the area defined by Pub. L. No. 116-23—should be held unlawful and set aside.

3.     Whether VA's revision to Sections IV.ii.1.H.4.a and IV.ii.1.H.4.b of the M21-1 Manual—which together limit VA's "special consideration" and concession of service connection to those who served

on military bases in Thailand to those "whose duties placed them on or near the perimeters of Thailand military bases"—should be held unlawful and set aside.

## STATEMENT OF THE CASE

***The United States uses Agent Orange in Vietnam; Congress passes laws to help veterans seeking benefits based on exposure to Agent Orange.***

During the Vietnam War, the U.S. military used several herbicides to defoliate the forests of South Vietnam. Adm. E.R. Zumwalt, Jr., *Report to the Secretary of the Department of Veterans Affairs*, reprinted in *Links Between Agent Orange, Herbicides, and Rare Diseases: Hr'g Before the Hum. Res. & Intergovernmental Rels. Subcomm. of the Comm. on Gov't Operations*, 101st Cong., 2d Sess. 23-24 (1990) ("Zumwalt Report"). The herbicides were sprayed from aircraft, from boats, and directly on the ground. *See* Institute of Medicine, *Veterans and Agent Orange Update 2010* 55 (2012), http://nap.edu/13166 ("IOM 2010 Update"). One of these herbicides was Agent Orange. *Id.* at 56. Nearly 50 million liters of Agent Orange were sprayed in the Republic of Vietnam during the Vietnam War. *Id.*

By 1968, questions began to emerge about Agent Orange's toxicity to humans, as scientists linked one of its chemical compounds (2,3,7,8-tetrachlorodibenzo-p-dioxin, known as "TCDD") to a potential increase in birth defects and deformities. Zumwalt Report at 26-27. The Department of Defense phased out the use of Agent Orange by 1971, *see* IOM 2010 Update at 57, but there were still serious concerns about the health effects on Vietnam veterans who had already been exposed.

In 1979, Congress responded to these concerns by requiring the VA to conduct a study of potential long-term adverse health effects on Vietnam veterans who were exposed to dioxins. Veterans Health Programs Extension and Improvement Act of 1979, Pub. L. No. 96-151 § 307, 93 Stat. 1092, 1097-98. Congress later reassigned responsibility for conducting that study to the Centers for Disease Control. See H.R. Rep. No. 98-592, at 5 (1984).

At the same time, veterans seeking disability benefits based on exposure to Agent Orange were facing challenges. To be eligible for compensation, a veteran must establish that a disability is "service-connected," which means that it is "incurred or aggravated ... in [the] line of duty in the active military, naval, or air service." 38 U.S.C.

§ 101(16). Establishing service connection generally requires the veteran to prove a "nexus"—"a causal relationship between the present disability and the disease or injury incurred or aggravated during service." *Holton v. Shinseki*, 557 F.3d 1362, 1366 (Fed. Cir. 2009) (quotation marks omitted).

Proving this causal connection, however, was difficult for Vietnam veterans who were suffering from illnesses they believed were connected to Agent Orange. There was scientific uncertainty regarding Agent Orange's health effects, as well as a lack of comprehensive documentary evidence regarding where and when the chemical was used. *See, e.g.*, Institute of Medicine, *Veterans and Agent Orange Update 2008* 23-24 (2009), http://nap.edu/12662 ("IOM 2008 Update").

Congress responded by enacting several laws to help veterans who were seeking disability benefits based on exposure to Agent Orange. *See* Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. No. 98-542, 98 Stat. 2725 (1984) (the "Dioxin Act"). Congress declared that there was emerging "evidence that chloracne, porphyria cutanea tarda, and soft tissue sarcoma are associated with exposure to certain levels of dioxin as found in some herbicides." *Id.*

§ 2(5), 98 Stat. at 2725.  It directed the VA to "establish guidelines and (where appropriate) standards and criteria for the resolution of claims," *id.* § 5(a)(1), 98 Stat. at 2727, based on dioxin exposure during service "in the Republic of Vietnam." *Id.* § 5(a)(1)(A), 98 Stat. at 2727.

In response, the VA first promulgated a regulation to govern disability benefits for chloracne, a skin condition.  That regulation established a presumption of exposure and service connection if the veteran served "in the Republic of Vietnam," which it defined to include "service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam."  38 C.F.R. § 3.311a(a)(1) (1986) ("Regulation 311").  Regulation 311's coverage tracked the language of the Dioxin Act and did not purport to limit the presumption only to veterans who set foot on the Vietnam landmass.  The VA later proposed to modify Regulation 311 to include soft tissue sarcomas in addition to chloracne.  56 Fed. Reg. 51,651, 51,651-52 (Oct. 15, 1991).

The VA then addressed service connection for non-Hodgkin's lymphoma, a form of cancer.  In 1991, it promulgated a regulation presuming service connection for non-Hodgkin's lymphoma for all

veterans who served in Vietnam.  *See* 38 C.F.R. § 3.313 ("Regulation 313").  That regulation tracked the language of Regulation 311, with minor variation.  It provided that "*[s]ervice in Vietnam* includes service in the waters offshore, or service in other locations if the conditions of service involved duty or visitation in Vietnam."  *Id.* § 3.313(a).  Like Regulation 311, Regulation 313 did not purport to limit its scope to presence on the Vietnam landmass.

### Congress passes the Agent Orange Act to provide service-connection status to diseases manifested by veterans who served in the Republic of Vietnam during the war.

On February 6, 1991, Congress passed the Agent Orange Act, Pub. L. No. 102-4, 105 Stat. 11.  The legislation sought "to settle the troubling questions concerning the effect on veterans of exposure to herbicides—such as Agent Orange—used in the allied effort during the Vietnam war."  137 Cong. Rec. 2345 (Jan. 29, 1991).

To that end, the Agent Orange Act codified the presumption of exposure and service connection for the three diseases covered by Regulations 311 and 313—non-Hodgkin's lymphoma, soft tissue sarcomas, and chloracne —if manifested by a veteran who "served in the Republic of Vietnam" during the war.  38 U.S.C. § 1116(a)(1)(B)(ii).

The Act also required the VA to identify any other disease shown over time to have a "positive association" with the "exposure of humans to an herbicide agent," and to "prescribe regulations providing that a presumption of service connection is warranted for that disease." Pub. L. No. 102-4, § 2(b)(1), 105 Stat. at 12 (codified, as amended, at 38 U.S.C. § 1116(b)(1)).

After the Agent Orange Act was passed, the VA interpreted the "served in the Republic of Vietnam" prerequisite for benefits. The VA amended its adjudication manual to adopt a policy consistent with the broad phrasing of the statute: "In the absence of contradictory evidence, 'service in Vietnam' will be conceded if the record[] shows that the veteran received the Vietnam Service Medal." VA Adjudication Procedures Manual M21-1 § 4.08(k)(1) (Nov. 8, 1991) (citation omitted).

The VA's general implementing regulation likewise tracked the statutory phrasing of the Agent Orange Act and afforded no significance to whether a veteran had been present on the Vietnam landmass. This regulation, adopted in 1994, defines service in the Republic of Vietnam in language that tracks Regulations 311 and 313, albeit with slightly different punctuation: "'Service in the Republic of Vietnam' includes

service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam." 38 C.F.R. § 3.307(a)(6)(iii).  This test applies to all the covered § 1116 diseases.  38 C.F.R. § 3.309(e).

Congress later amended the Agent Orange Act to codify the presumption of service connection for a total of eight disease categories. *See* 38 U.S.C. § 1116(a)(2).  The VA likewise modified its regulations to add several more diseases.  There are now fourteen diseases eligible for the presumption of service connection under the regulation.  *See* 38 C.F.R. § 3.309(e).

In early 2002, the VA amended the language of its M21-1 Manual. It abandoned the Vietnam Service Medal test, instead requiring veterans to show that they "actually served on land within the Republic of Vietnam" before the VA would apply the presumption of herbicide exposure.  M21-1, Pt. III, ¶ 4.24(e)(1) (Feb. 27, 2002).

In 2008, this Court addressed whether "blue water navy" veterans who served on ships offshore in the Republic of Vietnam's territorial sea "served in the Republic of Vietnam" under 38 U.S.C. § 1116.  Jonathan Haas, a Blue Water Navy Vietnam veteran, sought disability benefits

under the Agent Orange Act for multiple herbicide-linked conditions.

*Haas v. Peake*, 525 F.3d 1168, 1772-73 (Fed. Cir. 2008).  A divided panel

held that the statutory phrase "served in the Republic of Vietnam" was

ambiguous as to whether it included naval service in the territorial

waters off Vietnam's coast.  *See id.* at 1183-86.  The majority deferred to

the VA's asserted "boots-on-the-ground" policy as a reasonable

interpretation under *Chevron* Step Two and a legally permissible

interpretation of the VA's regulations under *Auer v. Robbins*, 519 U.S.

452 (1997).  *See Haas*, 525 F.3d at 1186-95.

**This Court decides Procopio, *and Congress enacts the Blue
Water Navy Vietnam Veterans Act of 2019.***

In *Procopio v. Wilkie*, this Court overruled the *Haas* decision and

held that "those who served in the 12 nautical mile territorial sea of the

'Republic of Vietnam' are entitled to § 1116's presumption if they meet

the section's other requirements."  913 F.3d 1371, 1380-81 (Fed. Cir.

2019) (*Procopio*).  Specifically, it stated that the "*Haas* court went

astray when it found ambiguity in § 1116," because "international law

uniformly confirms that the 'Republic of Vietnam' included its

territorial sea."  *Id.* at 1380.

Following the *Procopio* ruling, Congress passed the Blue Water Navy Vietnam Veterans Act on June 25, 2019, to "clarify presumptions relating to the exposure of certain veterans who served in the vicinity of the Republic of Vietnam." Pub. L. No. 116-23, 133 Stat. 966 (BWN Act). Section 2(a) of the BWN Act amends the Agent Orange Act by inserting a section to be codified as 38 U.S.C. § 1116A after § 1116. *Id.* § 2(a). Section 1116A expands the "[p]resumptions of service connection for veterans who served offshore of the Republic of Vietnam." 38 U.S.C. § 1116A. Specifically, it extends a presumption of service connection to veterans who "served offshore of the Republic of Vietnam" during the same dates defined in § 1116, and directs the Secretary to "treat a location as being offshore of Vietnam if the location is not more than 12 nautical miles seaward of a line commencing on the southwestern demarcation line of the waters of Vietnam and Cambodia and intersecting" a list of points defined by express latitudes and longitudes. *Id.* § 1116A(a)-(b), (d). However, nothing in the BWN Act purports to replace or restrict the presumption of service connection extended by § 1116 to veterans who served "in the Republic of Vietnam."

The BWN Act also authorized the Secretary of the VA to stay pending claims "relating to the service and diseases covered by [the BWN Act] … until the date on which the Secretary commences the implementation of … section 1116A." Pub. L. No. 116-23, § 2(c)(3), 133 Stat. at 968. On July 1, 2019, the Secretary stayed all claims filed under *Procopio* and the BWN Act. Appx68. After Military-Veterans Advocacy and others challenged the Secretary's authority to stay Blue Water Navy claims, this Court held that the Secretary had the authority to issue a stay, but only until its effective date, January 1, 2020. *Procopio v. Sec'y of Veterans Affs.*, 943 F.3d 1376, 1381 (Fed. Cir. 2019) (*Procopio II*). On January 1, 2020, the VA started to adjudicate Blue Water Navy claims. Appx16.

### The VA issues final rules regarding the presumption of service connection.

On December 31, 2019, in response to a rulemaking request, the VA amended its M21-1 Manual in three material respects.

First, the VA amended its Manual to expand the presumption of "exposure to herbicide agents" based on "service in the RVN." Appx37 (M21-1 Manual, § IV.ii.2.C.3.e). This rule defines "service in the RVN" to include service on land, aboard vessels operating on "inland

waterways … or eligible offshore waters," and "other locations, if the conditions of service involved duty or visitation on the ground in the RVN." *Id.* However, the rule also specifically excludes service in "Vietnamese airspace" from the definition of "service in the RVN." *Id.*

Second, the VA created new rules in its M21-1 Manual governing claims for herbicide exposure by blue-water navy veterans. Appx16-22 (M21-1 Manual, § IV.ii.1.H.1). The new rule centralizes processing for all herbicide claims from Vietnam-era veterans. *Id.* It then explains that "qualifying service" in the Republic of Vietnam includes "in-country, inland waterways, and eligible offshore waters *as defined in PL 116-23*," the BWN Act. Appx16 (emphasis added). But the BWN Rule does not reflect the holding of *Procopio* that the statutory phrase "in the Republic of Vietnam" must include the territorial sea. 913 F.3d at 1381. Neither does it implement the full scope of 38 C.F.R. § 3.307, which further extends the presumption of service connection to all "waters offshore" of the Republic of Vietnam. 38 C.F.R. § 3.307(a)(6)(iii).

Finally, the VA amended its rules governing claims for herbicide exposure in Thailand during the Vietnam era. Appx23-25 (M21-1, Section IV.ii.1.H.4). The rule sets forth seven steps for determining

whether a veteran "with service in Thailand during the Vietnam era" was exposed to herbicides. *Id.* The rule requires the VA to "concede herbicide exposure" for Air Force veterans who served at certain Royal Thai Air Force Bases and held security roles or worked "near the air base perimeter." *Id.* The rule also requires the VA to "concede herbicide exposure" for veterans who served at U.S. Army Bases in Thailand "as a member of a military police unit, or with a military police occupational specialty." *Id.* Otherwise, the rule offers no presumption of exposure to herbicides for veterans who served in Thailand during the Vietnam era.

### *Military-Veterans Advocacy files a petition for review.*

After the VA issued the final rules, Military-Veterans Advocacy filed a petition for review. Dkt. 1. On March 26, 2020, this Court designated this case a companion to *NOVA v. Secretary of Veterans Affairs*, No. 20-1321 (*NOVA*), and assigned it to the same merits panel. Dkt. 10.

On May 6, 2020, this Court granted initial en banc hearing in *NOVA* and issued its decision on December 8, 2020. Relevant to this case, the Court overruled *Disabled American Veterans v. Secretary of*

*Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017), and held that this Court has jurisdiction to review generally applicable interpretive rules promulgated in the Manual. *NOVA*, 981 F.3d at 1374. The en banc Court then referred the case to the merits panel to address NOVA's challenges to two Manual rules regarding service-related knee injuries (which are not at issue here). *Id.* at 1386.

## SUMMARY OF ARGUMENT

This Court should find that MVA has associational standing to challenge all three Challenged Rules issued by VA in its M21-1 Manual on December 31, 2019. Through affidavits attached hereto, MVA has established that at least one of its members would have standing to challenge each of the Challenged Rules.[1] Similarly, MVA's organizational purpose includes a strong interest in ensuring that its veteran members receive benefits to which they are entitled, a purpose that this challenge directly advances. Finally, MVA's challenges to VA's rules do not require the participation of any individual MVA members because the challenges focus on pure questions of law or on factual

---

[1] Affidavits from MVA's Chairman, John B. Wells and four of its members are included in the addendum to this brief at A1 through A7.

evidence not tied to any individual case.  As a result, MVA satisfies all three prongs of the test for associational standing.

Having found that MVA is a proper challenger, this Court should then invalidate all of the Challenged Rules.

**I.** This Court should hold unlawful the VA's Airspace Rule, which denies the presumption of service connection to servicemembers who flew over Vietnam and/or over its territorial sea but never set foot on the soil of the country.

The Airspace Rule is inconsistent with the plain text of the governing statute and this Court's ruling in *Procopio*.  The Agent Orange Act requires VA to grant a presumption of service connection to all veterans, including those in the air service, who served "in the Republic of Vietnam."  As this Court explained in *Procopio*, Congress intended that statutory phrase to include at least the land and sea over which the Republic of Vietnam held sovereignty.  But the same logic applies to airspace.  Under the Convention on International Civil Aviation, every country holds sovereignty over the airspace over both its land and its territorial sea.

Thus, veterans who served in the air above Vietnam served "in the Republic of Vietnam" no less than those on the land or the water, and they are entitled to the same presumption of service connection. Because VA's Airspace Rule purports to deny them that presumption, it cannot stand.

**II.** This Court should also hold unlawful the VA's BWN Rule, which restricts the presumption of service connection afforded to blue water navy veterans. Although it appears at first glance to control only where BWN claims are processed, it in fact denies any front line agency adjudicators the authority to concede exposure or service connection to any veteran who served outside the specific geographical area designated in the BWN Act. The BWN Rule is therefore invalid for two separate but related reasons.

First, the BWN Rule is inconsistent with the text of the relevant statutes. The BWN Rule apparently is based on VA's mistaken belief that the BWN Act supplanted, rather than supplemented, the Agent Orange Act. It did not. In the BWN Act, Congress instructed the Secretary only to *include* the area designated in the BWN Act in the agency's definition of "offshore." The Legislature did not prevent the

Secretary from treating additional areas as "offshore" and extending the same presumption of exposure and service connection.  Nor did it claim to override the Agent Orange Act's separate requirement to extend the presumption to veterans with service "in the Republic of Vietnam."

Second, the BWN Rule is also inconsistent with VA's own regulations implementing the Agent Orange Act.  VA correctly recognized, at the time the Agent Orange Act was enacted, that its presumption extended not only to the territorial sea, but to the "waters offshore"—a phrase it regarded as encompassing the entire theater of conflict around Vietnam.  Indeed, prior to 2002, the agency routinely extended the presumption to any veteran who received the Vietnam Service Medal, signifying service within a wide geographic boundary.  It rescinded that interpretation only when it erroneously concluded that its implementing regulations required that blue water navy veterans seeking the presumption of exposure show that they had set foot on Vietnamese soil.  This Court properly rejected the agency's position in *Procopio*, which leaves the original meaning of the regulatory phrase "waters offshore" in force.  The BWN Rule, by restricting the

presumption more narrowly, therefore directly conflicts with the implementing regulation.

**III.** Finally, this Court should hold unlawful the VA's Thailand Rules, which restrict the presumption of service connection afforded to veterans serving on bases in Thailand during the Vietnam era to only those with duties on the perimeter of the base. The Thailand Rules make at least two arbitrary distinctions among similarly situated veterans, and thus must fall.

First, the Thailand Rules deny the presumption of exposure to veterans whose official duties did not require their regular presence on the perimeter of the base. But herbicides do not distinguish between desks and beds or between soldiers on duty and those eating a meal. Veterans who ate, slept, exercised, or otherwise entered the broad 500-meter wind-drift zone around acknowledged herbicide spraying areas at the perimeter of each base would thus have received similar exposure to herbicides as did those who entered those areas on official duty. Yet the Thailand Rules nevertheless grant the presumption to one class of veteran, while denying it to the other. That distinction is arbitrary and capricious.

Second, the evidence available to the agency indicates that herbicides would have inevitably migrated throughout each base in Thailand, rather than remaining on the perimeter. Indeed, the evidence suggests that herbicides likely were regularly used at locations in the interior of bases in addition to the perimeter. As a result, the Thailand Rules' disparate treatment of veterans who served in the interior of Thailand bases has no basis in fact, making the Rules arbitrary and capricious.

## ARGUMENT

## I.    Standard of Review

This Court reviews petitions under 28 U.S.C. § 502 "in accordance with the standard set by the Administrative Procedures Act, 5 U.S.C. §§ 701-706." *Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1339 (Fed. Cir. 2003). As a result, this Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at 1339-40; 5 U.S.C. § 706(2).

## II.   MVA Has Associational Standing to Challenge the Rules.

MVA is a nonprofit, membership organization dedicated to serving veterans and veterans' attorneys—precisely the populations regulated and harmed by the challenged aspects of the VA's revisions to its M21-1 Manual.  MVA's membership includes both.  For example, MVA's founder, John B. Wells, is a retired Navy Commander, disabled veteran, and veterans' attorney all in one.  Given its composition, purposes, and activities, MVA has associational and direct standing to pursue all its challenges.

To establish associational standing, an organization must show that "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *NOVA*, 981 F.3d at 1368 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  Only the first two requirements come from Article III; the third is prudential.  *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555-56 (1996).  MVA satisfies each requirement for all of its challenges.

The first prong of the *Hunt* test is met when an organization has a veteran member with "an actual or potential claim [that] is sufficiently affected by the particular challenged rule to meet the requirements of actual or imminently threatened concrete harm and the other requirements for that member to have Article III standing." *NOVA*, 981 F.3d at 1370. MVA has such a member for each of the challenged rules:

- MVA member Jay Lawrence Cole has a claim before the Board of Veterans Appeals for benefits arising from exposure to herbicides while serving in Thailand. A1, ¶ 4. Mr. Cole served at U-Tapao Air Force Base in Thailand in 1967 and 1968, where he worked on the flight line and crossed the base perimeter. *Id.* ¶ 2. His sleeping quarters were only 60 meters from the perimeter, well within the 500-meter buffer zone for ground-level herbicide spraying outlined in the Army Field Manual. *Id.* ¶ 3. But because he did not have *duties* on the perimeter itself, Mr. Cole's claim was denied at the Regional Office. *Id.* As a result, Mr. Cole's claim is directly affected by the Thailand Rules. Mr. Cole has been a

member of MVA since before this petition was filed and serves on its board of directors. *Id.* ¶ 1.

- MVA member Leonard Brzozowski has a claim before the Board of Veterans Appeals for benefits arising from exposure to Agent Orange. A2, ¶ 7. In 1968-1969, Mr. Brzozowski was a Second Class Petty Officer aboard the USS Constellation in the waters off Vietnam, where he repaired aircraft that had flown missions in the theater. *Id.* ¶¶ 3, 5-6. He qualified for (and was awarded) the Vietnam Service Medal and the Republic of Vietnam Campaign Medal, among others. *Id.* ¶ 4. As a result, Mr. Brzozowski would be granted the presumption of service connection under a correct interpretation of the governing statutes, and his claim is directly affected by the BWN Rule. Mr. Brzozowski has been a member of MVA since before this petition was filed and is now a lifetime member. *Id.* ¶ 8.

- MVA member Frederick Hinchcliffe 2nd has a claim pending before the Board of Veterans Appeals for benefits arising from Agent Orange exposure. A3, ¶ 6. In 1966, Mr.

Hinchcliffe flew low-altitude bombing missions in Vietnam and Laos and was exposed to a "dense yellow haze" in his operating area. *Id.* ¶¶ 2-4. His flight path took him through airspace over South Vietnam and the territorial sea of Vietnam. *Id.* ¶ 5. As a result, Mr. Hinchcliffe would be granted the presumption of service connection under a correct interpretation of the governing statutes, and his claim is directly affected by the Airspace Rule. Mr. Hinchcliffe has been a member of MVA since before this petition was filed. *Id.* ¶ 1.

Second, MVA's challenge is relevant to its purpose of "advanc[ing] the interests of its members … who pay membership dues that help fund MVA's activities." A6, ¶ 4. MVA also maintains special-interest sections dedicated to blue water navy veterans, which includes those who served in the waters offshore Vietnam including those on aircraft carriers in Vietnam's territorial waters, and Veterans of Southeast Asia, which includes those stationed in Thailand. A6-A7, ¶ 5. MVA "maintains an interest in ensuring that its members receive all the benefits available under [veterans laws]." *Int'l Union, United Auto.,*

*Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986).  Because MVA's challenges "seek[] to protect the interests" of its members, which are "germane to [its] purposes," associational standing's second prong is satisfied.  *E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.*, 257 F.3d 1352, 1356 (Fed. Cir. 2001).

Finally, none of the challenges here require the participation of MVA's members.  Each "raises a pure question of law" and (2) the relief requested—the exclusion's invalidation—depends wholly on that question, such that this Court can resolve the challenge without inquiry into any veteran's situation.  *Brock*, 477 U.S. at 287-88; *see Hunt*, 432 U.S. at 344.  Specifically, each challenge and its requested relief turn on the interpretation of this Court's precedents and the relevant statutes, regulations, and the M21-1 Manual, as well as factual information and reports that are not tied to any specific veterans' claims.  Purely legal "challenges to [VA rules] do not require the participation of individual members."  *E. Paralyzed Veterans*, 257 F.3d at 1356.

As a result, MVA meets all three prongs of *Hunt* and has associational standing to bring these challenges.

### III. The Airspace Rule Should Be Invalidated as Contrary to Governing Law.

The M21-1 Manual presumes "exposure to herbicide agents" based on "service in the RVN." Appx37 (M21-1 Manual § IV.ii.2.C.3.e). The Manual defines "service in the RVN" to include service on Vietnamese land and water, but specifically excludes service in "Vietnamese airspace" from that definition. The Manual states: "The term service in the RVN does not include service of a Vietnam-era Veteran whose only contact with Vietnam was flying high-altitude missions in Vietnamese airspace." *Id.*

The Court should invalidate the Airspace Rule as contrary to the governing statute, international law, and this Court's recent decision in *Procopio*, 913 F.3d 1371 (Fed. Cir. 2019). As explained below, in passing the Agent Orange Act, Congress intended to grant a presumption of service connection to veterans who served in the "military, naval, or air service … in the Republic of Vietnam." 38 U.S.C. § 1116(a). In *Procopio*, this Court held that the "Republic of Vietnam" encompasses its territorial sea. 913 F.3d at 1375. By the same measure, the "Republic of Vietnam" clearly encompasses that country's airspace. Air service personnel who flew in Vietnamese airspace should

be granted the same presumption of service connection as naval personnel who served in its territorial sea.

As an initial matter, the Airspace Rule contradicts the plain text of the governing statute, 38 U.S.C. § 1116. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, courts use a two-step framework for "review[ing] an agency's construction of the statute which it administers." 467 U.S. 837, 842 (1984); *see, e.g.*, *Procopio*, 913 F.3d at 1375.

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Determining whether Congress has directly spoken involves "employing traditional tools of statutory construction"—including the text, legislative history, and canons of interpretation—to determine "congressional intent." *Id.* at 843 n.9. *Chevron*'s second step comes into play only if, after employing these traditional tools of statutory construction, the court is "unable to

discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018).

Here, there is no room for the VA's Airspace Rule because the statute is clear.  The statute grants a presumption of service connection to "a veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975."  38 U.S.C. § 1116(f).  The statute does not limit the presumption to veterans who served only on Vietnamese land or water.  Rather, it extends the presumption to all veterans who served in the "active military, naval, or *air* service … *in the Republic of Vietnam*."  *Id.* (emphasis added).  By its plain language, the presumption applies to veterans who served in the "air" in the Republic of Vietnam during the relevant time period.  And under clear principles of international and U.S. law, this includes the airspace above the Republic of Vietnam.

Under international law, countries have full sovereignty over the airspace above their territory.  *See* Convention on International Civil Aviation, T.I.A.S. No. 1591 (Dec. 7, 1944) (Chicago Convention).  The Chicago Convention, which the United States ratified in 1946, states:

"The contracting States recognize that every State has complete and exclusive sovereignty over the airspace above its territory." *Id.*, art. 1.[2] "[T]he principle of airspace sovereignty … is today an unquestioned principle of international law." *National Sovereignty of Outer Space*, 74 Harv. L. Rev. 1154, 1163-64 (1961). The United States likewise exercises absolute sovereignty over its own airspace. *See* 49 U.S.C. § 40103(a)(1) ("The United States Government has exclusive sovereignty of airspace of the United States.").

Indeed, in *Procopio*, this Court explained that the Agent Orange Act must be interpreted consistent with international law. The Court held that, under the plain text of 38 U.S.C. § 1116(a), veterans who served in the territorial sea of the Republic of Vietnam are entitled to the service-connection presumption if they meet the section's other requirements. *Procopio*, 913 F.3d at 1380-81. The Court explained: "Congress chose to use the formal name of the country and invoke a

---

[2] The Chicago Convention explains that, "[f]or the purposes of this Convention the territory of a State shall be deemed to be the land areas and territorial waters adjacent thereto under the sovereignty, suzerainty, protection or mandate of such State." T.I.A.S. No. 1591, art. 2. Accordingly, countries have full sovereignty over the airspace above their land areas and territorial waters.

notion of territorial boundaries by stating that 'service *in* the Republic of Vietnam' is included." *Id.* at 1375.  And because "international law unambiguously confirms" that the "Republic of Vietnam" includes its territorial sea, the Court concluded that Congress's intent was clear. *Id.*  "International law uniformly confirms that the 'Republic of Vietnam,' like all sovereign nations, included its territorial sea." *Id.* Veterans "who served in the territorial sea of the 'Republic of Vietnam' [are] entitled to § 1116's presumption." *Id.* at 1376.

The same reasoning applies here.  International law clearly establishes that the "Republic of Vietnam" includes the airspace above its territory.  Chicago Convention, T.I.A.S. No. 1591, art. 1.  "This was true in 1955 when the 'Republic of Vietnam' was created.  And this was true in 1991 when Congress adopted the Agent Orange Act." *Procopio*, 913 F.3d at 1375 (citation omitted).  The intent of Congress is therefore clear from the text of § 1116—veterans who served in the airspace of the "Republic of Vietnam" are entitled to § 1116's presumption.[3]

---

[3] When a statute is clear on its face, there is no need to resort to legislative history. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.

In addition, *Procopio* noted that the statute's express inclusion of "active military, naval, or air service … in the Republic of Vietnam," § 1116(a)(1), "reinforc[ed] [its] conclusion that Congress was expressly extending the presumption to naval personnel who served in the territorial sea." *Id.* at 1376. So too for the veterans who served in the "air … in the Republic of Vietnam." 38 U.S.C. § 1116(a)(1)(A). Congress clearly intended to extend the presumption of service connection to air personnel who served in the "air … in the Republic of Vietnam." This Court should vindicate Congress's intent and invalidate the provision of the Airspace Rule that purports to deprive air personnel of that presumption.

---

The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."). Nevertheless, even considering legislative history, there is no indication that Congress intended to exclude veterans who flew in Vietnamese airspace from the service-connection presumption. *See, e.g.*, 137 Cong. Rec. H719-01, H726 (daily ed. Jan. 29, 1991) (explaining that proposed legislation would, among other things, "grant presumptions of service connection for non-Hodgkin's lymphoma and soft-tissue sarcoma *in veterans who served in Vietnam"*) (emphasis added).

## IV. The BWN Rule Should Be Invalidated as Contrary to Governing Law.

### A. The BWN Rule conflicts with the controlling statutory text in the Agent Orange Act and the BWN Act.

#### 1. The BWN Rule erroneously restricts the presumption of service connection to veterans who served within the area defined by the BWN Act.

On the surface, the BWN Rule might appear to do no more than establish centralized claims-processing rules for adjudication of claims connected to service off the Vietnamese Coast. But upon closer examination, the BWN Rule also contains a subtle and erroneous limitation on the presumption of service connection.

As the BWN Rule's first section explains, VA established "centralized processing teams at designated regional offices (ROs) and decision review operations centers (DROCs)" as part of its implementation of the BWN Act. Appx16. It tasked these centralized processing teams with handling all concessions of qualifying service in herbicide cases brought after January 1, 2020 by "Vietnam-era Veterans for all branches of service," whether they stem from service "in country," on "inland waterways," or in "eligible offshore waters." *Id*. However, the BWN Rule also makes clear that the "eligible offshore

waters" are those "defined in *PL 116-23." Id.* The centralized processing teams are not given jurisdiction over claims stemming from service in any offshore or territorial waters of the Republic of Vietnam *outside* those specifically defined in the BWN Act.

But neither are any other front-line adjudicators permitted to concede service connection in such claims. Aside from legacy claims in which service connection has already been conceded, the BWN Rule gives "sole jurisdiction" over evaluation of qualifying service in offshore-waters claims to the centralized processing teams. *Id.* And to remove any doubt that VA's other adjudicators must turn over blue-water navy claims, the BWN Rule reiterates the point thrice more in the Notes following its overview:

Notes:

- Concession of qualifying service, to include in-country Republic of Vietnam (RVN) service, service on the inland waterways, and service on the eligible offshore waters as defined in the new law, is *the sole responsibility* of the centralized processing teams. Their evidence-based determination will be formally documented, uploaded to the Veteran's electronic claims folder (eFolder), and is binding on all ROs. *Effective immediately, ROs are no longer authorized to establish if a Veteran's service qualifies for herbicide exposure in RVN claims.*

- The centralized processing teams will be responsible for *all adjudication activities involved in processing blue water Navy contentions*, as well as all other concurrently pending non-blue water issues.

Appx16-17 (emphasis added).  Similarly, the following subsection of the BWN Rule provides an ostensibly comprehensive chart describing where any herbicide claim should be processed.  Appx17-18.  But the only category into which blue-water navy claims might fit is once again restricted to a "specific allegation of eligibility under the new law" and assigned to the centralized processing teams.  Appx17. As a result, VA has adopted the position that a sailor's entry into the waters specified in the BWN Act, and no others, can support a presumption of service connection for an herbicide claim.

>    **2.    The BWN Rule's restriction of the presumption of service connection conflicts with statute, international law, and this Court's rulings.**

But as with the Airspace Rule, VA's position is contrary to Congressional statute, to international law, and to this Court's decision in *Procopio*.

As noted above, the Agent Orange Act grants a presumption of service connection to any veteran who, "during active military, *naval*, or air service, served in the Republic of Vietnam" during specified dates.

38 U.S.C. § 1116(a)(1)(B) (emphasis added).  It does not limit that presumption any further.  The plain language of the statute thus grants the presumption to all veterans in "active … naval … service … in the Republic of Vietnam" during the relevant dates, without restricting that presumption to veterans who served within the geographic points recited in § 1116A (or any others, for that matter).

Instead, as this Court has already observed at length, the boundaries of "the Republic of Vietnam" are those laid down in a host of long-standing international laws, including the Geneva Agreements on the Cessation of Hostilities in Vietnam, art. 1, July 20, 1954, 935 U.N.T.S. 149 ("Geneva Accords"), the Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606, T.I.A.S. No. 5639 (Apr. 29, 1958) ("1958 Convention"), and the United Nations Convention on the Law of the Sea ("UNCLOS"), not to mention the Restatement of Foreign Relations Law.  *Procopio*, 913 F.3d at 1376.  These authorities "confirm[] that, when the Agent Orange Act was passed in 1991, the 'Republic of Vietnam' included … its 12 nautical mile territorial sea." *Id*.  Thus, this Court concluded "at *Chevron* step one that the intent of

Congress is clear from the text of § 1116: [a veteran] who served in the territorial sea … is entitled to § 1116's presumption." *Id.*

The distinction between § 1116 and § 1116A matters because each includes areas not covered by the other.  As even a cursory glance at a map will show, the coordinates listed in § 1116A range well off the coast of Vietnam in many places.  As a result, in those areas, § 1116A captures some 360 square nautical miles of sea that lie outside the territorial sea of the Republic of Vietnam.  A8.

Less obvious, but nonetheless true, is the fact that § 1116A does not capture the entire territorial sea of the Republic of Vietnam.  For example, the island of Phu Quoc lies off the west coast of Vietnam near its border with Cambodia and during the conflict hosted a well-known prisoner of war camp.  *Id.*  Although Phu Quoc was at all relevant times part of the sovereign territory of the Republic of Vietnam, nevertheless the border outlined in 38 U.S.C. § 1116A passes well to the south of the island and thus excludes the 12-mile territorial sea that surrounds it. *Id.*  Under *Procopio*, service in those waters is "service in the Republic of Vietnam" and therefore entitled to the presumption of service connection afforded by § 1116(a).

As a result, an adjudicator in one of VA's central processing teams will thwart Congress's intent by following the BWN Rule and granting a presumption of service connection *only* when a veteran's naval service falls within the § 1116A area. But VA can neither expand nor restrict the presumption that Congress has decreed—such agency actions are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and must be held unlawful and set aside by this Court. 5 U.S.C. § 706(2)(C).

### 3. The BWN Act supplements, rather than supplants, the Agent Orange Act.

VA may argue, as it has elsewhere, that there is no conflict because Congress intended the geographic points listed in 38 U.S.C. § 1116A to provide an *exclusive* definition, overriding any other statute that might afford a presumption of service connection for veterans who served "offshore" of Vietnam. *See, e.g.*, Resp. Br. 36-37, *Procopio II*, No. 19-2184 (Fed. Cir. Aug. 30, 2019), Dkt. 30. VA's position appears to rest on the preamble to 38 U.S.C. § 1116A(d), which states in full:

> Notwithstanding any other provision of law, for purposes of this section, the Secretary shall treat a location as being offshore of Vietnam if the location is not more than 12 nautical miles seaward of a line commencing on the

southwestern demarcation line of the waters of Vietnam and Cambodia and intersecting the following points: …

*Id.*

To the extent that VA clings to this position, it is mistaken; the plain meaning of section 1116A(d) is strictly expansive.  By instructing the Secretary to treat the geographic points listed therein as being offshore of Vietnam "[n]otwithstanding any other provision of law," Congress did not purport to override any other statute or regulation's definition of the word "offshore."  Indeed, § 1116A(d) does not even claim to *define* the term "offshore."  Instead, it merely sets a geographic boundary that the Secretary must "treat … as being offshore of Vietnam."  *Id.*  Thus, on its face, § 1116A(d) recognizes that the phrase "offshore of Vietnam" might encompass additional areas beyond those expressly listed in subsection (d)—but it must include *at least* the listed areas.

Neither did Congress attempt to restrict, through § 1116A, any presumption of service connection available through another statute.  Indeed, § 1116A(d) expressly provides that Congress's list of geographic points is to be treated as "offshore of Vietnam" only "for purposes of this section"—namely § 1116A itself.  To the extent that any other statute or

regulation uses the term "offshore," it may take a different and perhaps broader meaning.  In particular, by restricting its effect to "this section," § 1116A(d) does nothing to overrule VA's long-standing interpretation that "service in the Republic of Vietnam" as used in the Agent Orange Act "includes service in the waters offshore."  38 C.F.R. § 3.307(a)(6)(iii) (interpreting 38 U.S.C. § 1116(a)).  Nor does it interfere with the en banc ruling in *Procopio*, where this Court held that the presumption of service connection provided by 38 U.S.C. § 1116 and (among others) 38 C.F.R. § 3.307(a)(6) extends to naval veterans who served "offshore" in the territorial waters of the Republic of Vietnam but never set foot on Vietnamese soil.  913 F.3d at 1373, 1375-77.

In short, § 1116A does exactly one thing: ensure that the geographic area it delineated could not be cut down by another statute or by a future VA regulation or rule interpreting some other portion of Title 38.  Because nothing in § 1116A deprives the Agent Orange Act or VA's regulations implementing the Agent Orange Act of their force, the BWN Rule improperly deprives veterans who served in portions of the territorial sea of the Republic of Vietnam of the presumption of service

connection. On this basis alone, this Court should hold the BWN Rule

unlawful and set it aside.

### B. The BWN Act also conflicts with VA's regulations implementing the Agent Orange Act.

Beyond the narrow distinction outlined above, the BWN rule

conflicts more deeply with VA's contemporary understanding of its own

regulations implementing the Agent Orange Act. When initially

adopted, and for nearly a decade after, VA understood the Agent

Orange Act to extend the presumption of service connection not only to

the territorial sea around Vietnam, but to the entire theater of conflict.

In its regulations implementing the Agent Orange Act and its

predecessors, VA consistently interpreted the statutory phrase "in the

Republic of Vietnam" to include the "waters offshore" the Vietnamese

coast. For example, in 1984, VA promulgated a regulation establishing

a presumption of exposure and service connection for veterans suffering

from chloracne who served "in the Republic of Vietnam" as used in the

Dioxin Act. VA defined such service to include "service in the waters

offshore and service in other locations, if the conditions of service

involved duty or visitation in the Republic of Vietnam." 38 C.F.R.

§ 3.311a(a)(1) (1986). It did much the same in 1991, when it

promulgated a second regulation presuming service connection for veterans with non-Hodgkins lymphoma. *See* 38 C.F.R. § 3.313(a) (defining service "in Vietnam" to include "service in the waters offshore, or service in other locations if the conditions of service involved duty or visitation in Vietnam."). VA echoed these earlier regulations in its 1994 regulation implementing the Agent Orange Act, where it again defined "[s]ervice in the Republic of Vietnam" to include "service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam." 38 C.F.R. § 3.307(a)(6)(iii).

At the same time, VA expressly signaled that it understood these "waters offshore" regulations to encompass the entire Vietnamese theater of conflict. Shortly after passage of the Agent Orange Act, VA instructed its adjudicators, through its M21-1 Manual, to concede service connection "if the record[] shows that the veteran received the Vietnam Service Medal." M21-1 Manual § 4.08(k)(1) (Nov. 8, 1991) (citation omitted) (the "Theater-of-Conflict test"). Blue water navy veterans were at all relevant times eligible for the Vietnam Service Medal, even when serving in waters well outside the territorial sea of

Vietnam. *See* Exec. Order No. 11,231, Establishing the Vietnam Service Medal, 30 Fed. Reg. 8665 (1965) (establishing the Vietnam Service Medal for "members of the armed forces who serve[d] in Vietnam or contiguous waters or air space"); Exec. Order No. 11,216, Designation of Vietnam and Waters Adjacent Thereto as a Combat Zone for the Purposes of Section 112 of the Internal Revenue Code of 1954, 30 Fed. Reg. 5817 (1965) (defining the theater of combat to include Vietnam and "the waters adjacent thereto" and listing latitude and longitude pairs); *see also* 32 C.F.R. § 578.26(f) (2006) (defining "Vietnam and contiguous waters" for the purpose of the Vietnam Service Medal to include the geographic limits listed in Exec. Order No. 11,216). And for nearly a decade thereafter, VA consistently—and automatically— recognized that blue water navy veterans who received the Vietnam Service Medal had served "in the waters offshore" Vietnam under 38 C.F.R. § 3.307(a)(6)(iii) and applied the presumption of herbicide exposure Congress provided in the Agent Orange Act.

The VA's "waters offshore" regulations remain in force today. Their language has not changed in any relevant respect since they were adopted. As a result, the contemporary meaning that VA itself ascribed

to the phrase "waters offshore" should control—the presumptions of exposure and service connection should extend to all blue water navy veterans who served in the Vietnamese theater of combat.

That the VA later erroneously abandoned its theater-of-conflict interpretation of "waters offshore" does not undermine this straightforward conclusion. To be sure, in 2002, the VA revised its M21-1 Manual to drop any reference to the theater of conflict and instead require a blue water navy veteran to show that he "actually served on land within the Republic of Vietnam" before receiving the presumption of herbicide exposure. M21-1 Manual Pt. III, ¶ 4.24(e)(1) (Feb. 27, 2002).[4] But that position did not alter the meaning ascribed to the phrase "waters offshore." Rather, VA based its Manual revision on its mistaken belief that the "duty or visitation" clause in the implementing regulation cabined both "service in other locations" (which it directly modifies) and the earlier "waters offshore" (which it does not). *Procopio*, 913 F.3d at 1381 (Lourie, J., concurring); 38 C.F.R.

_____

[4] VA also twice proposed regulations that would codify this novel interpretation. See Presumptions of Service Connection for Certain Disabilities, and Related Matters, 69 Fed. Reg. 44,614, 44,620 (July 27, 2004); Definitions of Service in the Republic of Vietnam, 73 Fed. Reg. 20,566, 20,567 (Apr. 16, 2008). However, neither rule was finalized.

§ 3.307(a)(6)(iii).  But this Court rejected VA's mis-parsing of the regulatory text in *Procopio*, 913 F.3d at 1376-78, leaving the original meaning of "waters offshore" unfettered by any "boots-on-the-ground" requirement.  As a result, VA's regulations require, as they always have, that veterans with service throughout the Vietnamese theater of conflict be eligible for the presumption of service connection under 38 U.S.C. § 1116.

*Procopio* offers further guidance that leads to the same result.  For example, VA conceded at argument that "the 'waters offshore' are broader than the territorial sea."  *Procopio*, 913 F.3d at 1377.  The *Procopio* Court likewise carefully and consistently repeated that the statutory phrase "in the Republic of Vietnam" *included* the territorial sea; nowhere did it hold that the presumption of service connection ended at the 12-mile boundary.  *Id.* at 1375-80; *accord id.* at 1381-82 (Lourie, J. concurring).  Indeed, the en banc Court recognized that the statutory phrase "waters adjacent" as used in a variety of other statutes is "distinct from, and extend[s] beyond, [the] territorial sea" of the relevant country.  *Id.* at 1379.  Thus, VA's use of the analogous phrase "waters offshore" should similarly apply to a larger area, namely the

Vietnamese theater of conflict recognized by VA in its initial interpretation of its regulations.

Now that this Court has struck down VA's errant construction of the *grammar* of 38 C.F.R. § 3.307(a)(6)(iii), the unchanged meaning of "waters offshore" once again shines through unimpeded. VA's implementing regulation therefore requires the presumption of service connection extend to all blue water navy veterans within the Vietnamese theater of conflict. And because the BWN Rule directly conflicts with that regulation, it must fall.

## V. The Thailand Rules Should Be Invalidated as Arbitrary and Capricious Because They Do Not Account for Inevitable Exposure to Veterans Outside Their "Duties."

### A. Veterans who slept and ate near the perimeter of a base in Thailand were exposed to herbicides but are denied the presumption of exposure.

The M21-1 Manual extends "a special consideration of herbicide exposure on a factual basis" to veterans "whose duties placed them on or near the perimeters of Thailand military bases." Appx23. In particular, the Manual instructs adjudicators to concede "herbicide exposure on a direct/facts-found basis" to specific categories of veterans, including security personnel, military police, and those whose duties are

"otherwise near the air base perimeter as shown by evidence of daily work duties, performance evaluation reports, or other credible evidence." Appx24. But it denies the same automatic concession to veterans whose sleeping quarters, mess and recreation halls, or other regular activities outside their regular "duties" occurred on or near the perimeter of the same bases. *Id.* (requiring specific factual review).

By limiting the presumption of service connection conceded by VA to only those veterans with *duties* on the perimeter of the base, the Thailand Rules require VA's front line adjudicators to make distinctions between veterans with no basis in fact. "In various contexts, courts have recognized that treating 'like cases differently' can be arbitrary and capricious." *Hansen-Sorensen v. Wilkie*, 909 F.3d 1379, 1384 (Fed. Cir. 2018). This Court should do the same here because veterans who merely ate, slept, exercised, or played near the perimeters of the Thailand military bases were exposed to herbicides no less than security forces and military police who *worked* near the same perimeter.

VA was of course correct to extend a presumption of herbicide exposure to veterans whose duties took them to the perimeter of military bases in Thailand. The Contemporary Historical Examination

of Current Operations Report for Base Defense in Thailand ("CHECO Report"), prepared in 1973, documented numerous practices in use at the relevant bases in Southeast Asia during the Vietnam era. Appx277. Among other security measures, the CHECO Report confirms that the military employed herbicides at the perimeters of its bases in Thailand to assist with vegetation control, improve visibility, and deny enemy forces cover and concealment. Appx348. And as a recent GAO report notes, many, if not most, of the herbicides in use in Southeast Asia, even if not formally designated as Agent Orange, "contained the form of n-butyl 2,4,5-T found in Agent Orange and thus its associated contaminant, 2,3,7,8-TCDD." *Agent Orange, Actions Needed to Improve Accuracy and Communication of Information on Testing and Storage Locations*, GAO, 11 (Nov. 2018), https://www.gao.gov/assets/gao-19-24.pdf; *see also* Appx12; *see also* 38 C.F.R. § 3.307(a)(6)(i) (defining "herbicide agent" to include "2,4-D; 2,4,5-T and its contaminant TCDD"); Appx149-152 (Army Supply Bulletin SB 3-40, cataloguing herbicides in use in 1968).

But while extending the presumption of herbicide exposure to veterans with duties on the perimeter is correct, denying that same

presumption to other service members stationed on the same base, at the same time, defies logic and common sense.

Herbicides do not politely confine themselves to landing on the precise plants the military wishes to eliminate. As early as December, 1971, the Army Field Manual 3-3: Tactical Employment of Herbicides ("Field Manual") acknowledged that aerial spraying of herbicides could spread droplets of toxic chemicals at least two kilometers—and under poor conditions, up to *sixteen* kilometers—downwind from the drop site. Appx168-169. Ground-spraying methods were only partly effective in reducing wind drift. To achieve the most targeted application, the Field Manual discouraged deployment of herbicides in winds over 10 knots or at times when rain was expected. Appx170. But even under such ideal conditions, the Army admitted that droplets could drift on the wind for long distances; the Field Manual recommended a 500-meter buffer distance "to avoid damage to desirable vegetation near the target [of the spraying]." Appx170. In other words, the evidence shows that surfaces within five football fields of the perimeter of Thailand bases would be contaminated with toxins whenever herbicides were deployed at the base perimeter by any available method.

Neither do herbicides selectively contaminate work surfaces. Take MVA veteran member Mr. Cole as an example. His sleeping quarters were within 60 meters of the perimeter of U-Tapao Air Force Base in Thailand. A1, ¶ 3. He also crossed the base perimeter, though admittedly not as part of his duties. *Id.* ¶ 2. It is not hard to see that Mr. Cole would regularly contact doorknobs, windows, and other exterior surfaces exposed to drifting herbicide droplets. And military bunks were hardly airtight. Interior surfaces, clothing, and personal possessions likely were exposed as well. All this would add up to exposure at least comparable to the security forces and military police afforded the presumption of exposure under the Thailand Rules— consider whether one's exposure is more likely when one's desk or one's toothbrush is a few dozen yards from clouds of herbicide sprayed along the fences. But because Mr. Cole's duties on the flight line were away from the perimeter, VA did not presume exposure to herbicide, denied his claim at the regional office, and forced him to seek relief from the Board of Veterans Appeals. *Id.* ¶¶ 3-4.

Mr. Cole was thus treated differently from an otherwise identical military police officer who worked, rather than slept, near the base

perimeter. Every other veteran who ate, slept, exercised, or played near the perimeter would similarly be denied a presumption of exposure to herbicide that would be granted to that MP. Such unequal treatment of like cases is the epitome of an arbitrary and capricious rule. *Hansen-Sorensen*, 909 F.3d at 1384.

**B. Veterans stationed on the interior of bases would also have been exposed but are denied the presumption of exposure.**

As detailed above, it is easy to see that treating those veterans who worked in the wind-drift zone near the perimeter of each base differently from those who instead slept (or brushed their teeth) there is arbitrary. But in fact, the available evidence shows both that other contamination vectors beyond wind drift would have spread herbicide throughout each of the Thailand bases and that herbicide was used in the interior itself. As a result, the presumption of herbicide exposure should extend to all veterans stationed at Thailand bases during the Vietnam era, regardless of where on the base they were located.

As noted in the Field Manual, Agent Orange was mixed with diesel fuel in a 1:10 ratio before spraying, to help the herbicide adhere to the plants and deliver its toxic payload. Appx170. But that same

mixture adheres well to soil, clothing, shoes, containers, equipment, and vehicles within the spray zone or the down-wind drift zone. Appx6. As a result, the herbicide-diesel mixture would have attached itself to the personnel near the perimeter of the base, or even those merely crossing through the perimeter, and followed them to all areas of the base. Appx6. The same personnel, and any vehicles crossing through the perimeter area, would have tracked soil and mud coated in the herbicide-diesel mixture into barracks, garages, mess halls, latrines, showers, laundries, offices, and various other facilities, even deep in the interior of the base. Appx6-8. And because many, if not all, of these facilities were shared in common by a number of veterans, even those who rarely, if ever, visited the perimeter would have been exposed to the toxins. Appx6.

In addition, it is likely that the same herbicides used at the perimeter of the base were used elsewhere in the interior as well. For example, the CHECO Report notes that the U.S. Embassy's Rules of Engagement approved herbicides for use "on areas within the perimeter"—not only *at* the perimeter. The CHECO Report also describes, for example, use of herbicides at the Korat Air Force Base in

1972. There, "[v]egetation control was a serious problem" not only at "many sectors of the concertina wire *on the perimeter*" but also "in the critical RTAF area near the end of the runway" and "in the area contiguous to the unrevetted KC-135 parking ramp." Appx358 (emphasis added). To combat the problem, the base had received permission to use herbicides and had begun spraying the affected areas. *Id.* Similarly, at Nakhon Phanom Air Force Base, "heavy use of herbicides kept [vegetation] growth under control *in the fenced areas*." Appx359 (emphasis added). And at U-Tapao, where Mr. Cole was stationed, "[v]egetation control was all but impossible *over the entire reservation*" in part because the base was unable to get herbicides during the first half of 1972. Appx365 (emphasis added). The inescapable conclusion is that the military made regular use of herbicides well within the interior of the Thailand bases, at least when it could get its hands on them.

Thus, the evidence available to the agency shows that herbicides would have been present in all areas of the base, whether because they were tracked throughout the facility on the clothing and shoes of those personnel with duties on the perimeter, because they clung to the

vehicles transitioning in and out of the base, or because the military directly sprayed in the interior itself. Yet the Thailand Rules nevertheless afford a presumption of herbicide exposure only to those veterans with duties on the base perimeter. As before, blatantly disparate treatment of similarly situated veterans must be arbitrary and capricious. *Hansen-Sorensen*, 909 F.3d at 1384.

### C. Although VA promised in 2017 to account for these disparate treatments of veterans, the Thailand Rules correct none of the known flaws.

VA was not ignorant of the flaws in its adjudication of claims for herbicide exposure in Thailand at the time it issued the challenged Thailand Rules. Over three years earlier, Charles Beck and two other veterans had petitioned VA for a rulemaking mandating that all veterans stationed on bases in Thailand be presumed exposed to herbicides. Appx127-189 (the "Beck Petition"); *see also* Appx122 (VA acknowledging receipt of the Beck Petition in December 2015).[5] That petition decried the "dual standards" applied in VA's adjudication of claims of herbicide exposure at Thailand bases, collected numerous

---

[5] Because Mr. Beck is the first petitioner listed on the cover, this brief refers to the petition as the "Beck Petition."

examples of inconsistent rulings from VA adjudicators hearing such cases, and offered to provide still more examples. Appx132-135. It also noted that even then, the Secretary was aware of the CHECO Report and that it demonstrated the "significant" use of herbicides at the perimeter of Thailand bases. Appx135. Finally, the Beck Petition attached excerpts of the Army Field Manual 3-3, CHECO Report, and other evidence noted above of the manner in which herbicides were deployed in Thailand during the Vietnam era. Appx143-189.

In response—but over a year and a half after Mr. Beck's petition— VA purportedly granted Mr. Beck's request to initiate rulemaking and even promised to publish a proposed rule in the Federal Register. Appx122. But VA published no proposed rule. Neither did it relax its rule in the M21-1 Manual restricting the presumption of herbicide exposure to veterans with duties at the perimeter of Thailand bases, as it should have done. Instead, after another two years, VA issued the Thailand Rules, retaining all of their flaws despite the weight of

evidence against the distinctions that those rules draw between similarly situated veterans.[6]

Because the Thailand Rules treat differently veterans with similar exposure to herbicides, without any basis in fact—indeed, in defiance of the available evidence—they are arbitrary and capricious. This Court should invalidate them and extend the presumption of herbicide exposure (and with it, the presumption of service connection) to all veterans serving on U.S. military bases in Thailand during the Vietnam era. At the very least, the Court should invalidate the Thailand Rules and extend the presumption of herbicide exposure to all veterans who regularly spent time—on or off duty—near the perimeter of bases in Thailand during the Vietnam Era.

---

[6] VA has previously insisted that the Thailand Rules it issued in December 2019 are not a "rule" because they appear in the M21-1 Manual. *See* Appx1-2. But that position is no longer tenable in the wake of this Court's en banc ruling in *NOVA*. Claims for compensation subject to the Thailand Rules are authorized by 38 U.S.C. § 1110, which grants eligible veterans entitlement to compensation for "disability from personal injury suffered or disease contracted in the line of duty." The Thailand Rules are at least an interpretive rule of general applicability because they "govern[] all regional office adjudications of [Thailand herbicide exposure] claims, affecting an open-ended category of veterans" with such claims. *NOVA*, 981 F.3d at 1374.

# CONCLUSION

This Court should invalidate Sections IV.ii.1.H.1.g, IV.ii.1.H.4.a, IV.ii.1.H.4.b, and IV.ii.2.C.3.e of the M21-1 Manual.

Respectfully submitted,

*/s/Jeffrey T. Quilici*

| | |
|---|---|
| John B. Wells | Jeffrey T. Quilici |
| MILITARY-VETERANS ADVOCACY INC. | ORRICK, HERRINGTON & |
| P.O. Box 5235 | SUTCLIFFE LLP |
| Slidell, LA 70469-5235 | 300 W. 6th Street, Suite 1850 |
| | Austin, TX 78701 |
| Melanie R. Hallums | (512) 582-6950 |
| ORRICK, HERRINGTON & | |
| SUTCLIFFE LLP | Melanie L. Bostwick |
| 2121 Main Street | ORRICK, HERRINGTON & |
| Wheeling, WV 26003 | SUTCLIFFE LLP |
| | 1152 15th Street NW |
| | Washington, DC 20005 |

*Counsel for Petitioner*

April 15, 2021

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 11,460 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/Jeffrey T. Quilici*
Jeffrey T. Quilici
*Counsel for Petitioner*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Affidavit of Jay Lawrence Cole, USAF (Retired),
dated April 9, 2021 ........................................................ A1

Affidavit of Leonard Brzozowski, USN (Retired),
dated April 7, 2021 ........................................................ A2

Affidavit of Frederick Hinchliffe 2nd, USN (Retired),
dated April 8, 2021 ........................................................ A3

Affidavit of Michael Austin, USN (Retired),
dated April 6, 2021 ........................................................ A5

Declaration of John B. Wells, USN (Retired),
dated April 15, 2021 ...................................................... A6

Letter from John B. Wells to Robert L. Wilkie,
dated December 7, 2020 ................................................. A8

STATE OF INDIANA
COUNTY OF HAMILTON

NOW COMES BEFORE ME, Notary Public, Jay Lawrence Cole a person of the age of majority, who under oath did depose and say:

1. I am a member of Military-Veterans Advocacy since January of 2020. I currently serve on the organizations board of directors.

2. I was a member of the United States Air Force from ____May 12, 1966___ until _January 16, 1970_____and served at U-Tapao Air Force Base, Thailand from November 1967 - November 1968 in Field Maintenance Squadron (FMS), Environmental Systems Shop. (MOS) AFSC 42251. I worked on the flight line and did not have duties on the base perimeter although I did cross the perimeter.

3. I currently have an active claim before the Department of Veterans Affairs for diabetes. It was denied at the Regional Office level in March of 2020 because I did not have duties on the perimeter. My sleeping quarters were a couple of hundred feet or around 60 meters from the western outer perimeter. The Army Field Manual that provided guidance for ground level herbicide spraying required a 500-meter buffer zone to allow for wind drift. Army Field Manual 3-3 Tactical Employment of Herbicides (1971).

4. I have a concrete interest in the case of *Military-Veterans Advocacy v. Secretary of Veterans Affairs,* docket number #2020-1537 as I was exposed to herbicide while serving in Thailand.

5. Affiant further sayeth naught.

_____
Jay Lawrence Cole

SUBSCRIBED TO AND SWORN Before me, Notary Public, this ___9TH___ day of April 2021.

_____
Notary Public

BARRY LAWRENCE
My Commission Expires
September 13, 2028
Commission Number NP0728675
Hamilton County
SEAL

02-161010

STATE OF NEW JERSEY
COUNTY OF UNION

1. Before me, Notary Public, came and appeared Leonard Brzozowski, a person of the age of majority who is known to me who did, under oath, say and depose the following:

2. I was in the Navy from February 20, 1967 - November 2, 1970. I was assigned to Fighter Squadron 143 (VF143).

3. I was deployed on the USS Constellation (CVA64) during the years of 1968-1969 and 1969- 1970. During this time period the ship was deployed to the waters off Vietnam. I made the entire deployment and was onboard the ship for all deployments. My rank was AQF2. I was an Aviation Fire Control Fighter, Second Class Petty Officer.

4. I was awarded several medals:
        Vietnam Service Medal with 2 stars - awarded twice
        Republic of Vietnam Campaign Medal
        Meritorious Unit
        Commendation National
        Defense Service Medal
        Armed Forces Expedition Medal for Service off Korea

5. While on the USS Constellation, I was a Flight Deck Trouble Shooter. I would greet the pilots after they landed and check to see if there were any problems. I would make any needed repairs. The planes were F4 Phantom planes that were loaded with various ordnance.

6. The planes were never washed down before I would climb around on them. I would start climbing around and checking for problems right after they landed.

7. I currently have Multiple Myeloma, since 2007. I have had 2 bone marrow transplants, called Autologous (Stem Cell Rescue). I have Peripheral Neuropathy caused by Thalomid which is a medication I had to take. I have also had a Allogeneic transplant. I am a borderline diabetic. I have a claim before the VA BVA docket number 16-07 102.

8. I have been a member of Military-Veterans Advocacy since December of 2019 and I am now a lifetime member.

9 Affiant further sayeth naught.

Leonard Brzozowski

SUBSCRIBED TO AND SWORN Before me, Notary Public, this 7 day of April 2021.

Notary Public

A2

STATE OF MASSACHUSETTS
COUNTY OF WORCESTER

NOW COMES BEFORE ME, Notary Public, Frederick Hinchliffe 2nd a person of the age of majority, who under oath did depose and say:

1.  I am a member of Military-Veterans Advocacy since January of 2020.

2   In 1966 I was a US Navy pilot flying F4B Phantom aircraft and assigned to Fighter Squadron 14. During the period from August 1966 through December 1966, the squadron was deployed to the Tonkin Gulf aboard the aircraft carrier USS Franklin D. Roosevelt (CVA-42) as a unit of Carrier Air Wing One (CVW-1). Our squadron predominately flew armed reconnaissance, ship air defense, and coordinated strike missions over or near the North Vietnam mainland.

3.  At the end of December 1966, there was a "stand down", a cessation of flights over North Vietnam. On December 22, 1966, I was ordered to fly a mission into Laos to conduct bombing of targets to be designated by a forward air controller (FAC). We were a flight of two F4B aircraft.

4.  We launched from the Roosevelt, flying towards Laos, crossing the Vietnamese DMZ over South Vietnam at about 3000 feet. Within the DMZ, the air was significantly thick with yellowish haze. We could see that the ground was devastated by bombing and that all vegetation was defoliated. The aircraft cockpit air system drew in ambient air to support the cockpit environment. Although I wore an oxygen mask, the aircraft interior and my clothing would have been contaminated from the external environment. We made contact with the Forward Air Controller, who directed us to several targets, which we attacked with low altitude bombing runs. We returned to the Roosevelt by the same route, once again observing the dense yellow haze in the DMZ. After landing, we deplaned by climbing down the outside of the aircraft, exposing our bodies and clothing to contamination.

5.  My flight path took us over South Vietnam and the territorial sea of Vietnam. We did not land in Vietnam.

6. I currently have a claim pending before the Board of Veterans Appeals for benefits arising out of Agent Orange exposure. The docket number is 25079272. I have a concrete interest in the case of *Military-Veterans Advocacy v. Secretary of Veterans Affairs,* docket number #2020-1537 as I entered the airspace of the

Republic of Vietnam.

7.    Affiant further sayeth naught.

_____
Frederick Hinchliffe 2nd

SUBSCRIBED TO AND SWORN Before me, Notary Public, this ____8th____ day of April 2021.

_____
Notary Public

THARANI THAMBIRAJAH
Notary Public
Commonwealth of Massachusetts
My Commission Expires May 20, 2027

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

1.   Before me, Notary Public, came and appeared Michael Austin, a person of the age of
     majority who is known to me who did, under oath, say and depose the following:

2.  I was in the Navy from December 1970 - September 24, 1976.  My rank at discharge was
    ETR2.  I was deployed on the USS *Kansas City*.  I received the National Defense Service
    Medal.

3.  I cannot find that the *USS Kansas City* was in the Territorial Sea.  However, while I was
    onboard, the ship deployed to the Western Pacific, including off the coast of Vietnam.
    These deployments were from May through December 1973, then September 1974
    through February 1975. On July 20, 1973 and other dates, the ship was within the
    Vietnam Service Medal area.

4.  I did not receive the Vietnam Service Medal.  During that time period, there was no
    authority to award the medal.  It expired 60 days after the Paris Peace accord and did not
    restart until the beginning of Operations Eagle Pull and Frequent Wind l which took place
    after my ship left the area.

5.  While on the USS *Kansas City*, helicopters used to come in from South Vietnam.  They
    would also bring the mail which originated from the Fleet Post Office location in Da
    Nang. I served as part of the helicopter flight quarters detail.

6.  I currently have a claim for Agent Orange benefits.  I have Type 2 Diabetes.  I have had a
    heart attack and have symptomatic heart disease and high blood pressure.  The claim
    number used by the VA is my social security number.

7.  I have been a member of Military-Veterans Advocacy since October of 2015.

8.  Affiant further sayeth naught.

                                    *Michael C Austin*
                                    Michael Austin

        SUBSCRIBED TO AND SWORN Before me, Notary Public, this __6th__ day of
__April__, 2021.

                                    *Kenesha Antoine*

                                    Notary Public

KENESHA  ANTOINE
NOTARY PUBLIC
STATE OF LOUISIANA
EAST BATON ROUGE PARISH
NOTARY ID # 86023
MY COMMISSION IS FOR LIFE

A5

DECLARATION OF COMMANDER JOHN B WELLS, USN (RETIRED)
CHAIRMAN OF THE BOARD AND DIRECTOR OF LITIGATION FOR
MILITARY-VETERANS ADVOCACY

I, Commander John B. Wells USN (retired), make the following declaration, under penalty of perjury, pursuant to 18 U.S.C. § 1746:

1. I am an attorney at law, admitted in the District of Columbia, Commonwealth of Pennsylvania, and the State of Louisiana. I am admitted to practice before the Department of Veterans Affairs (VA) as well as to the bars of the United States Court of Appeals for Veterans Claims, the United States Court of Appeals for the Federal Circuit, and the Supreme Court of the United States. Accordingly, I represent veterans at every stage of the proceedings. I am also a disabled veteran having served 22 years on active duty in the United States Navy. I spent approximately ten of those years at sea on several different ships. I am qualified as a surface warfare officer, Navigator, and for command at sea. I was also awarded a mechanical engineering subspecialty.

2. In December of 2012, I founded and incorporated Military-Veterans Advocacy (MVA) as a 501(c)(3) non-profit corporation under the laws of the State of Louisiana. MVA is a membership organization. At the time of incorporation, I was the sole member. I have maintained that membership until the present day. I was the founding Executive Director. As of this date I am the Chairman of the Board for the organization. At the time of this petition, I was also MVA's Director of Litigation, in which capacity I authored and filed MVA's original petition in this case (ECF No. 1-2) on behalf of the organization and its members.

3. MVA litigates and advocates on behalf of servicemembers and veterans and its members. Part of MVA's mission is to educate and train servicemembers and veterans concerning rights and benefits, represent veterans contesting the improper denial of benefits, and advocate for legislation to protect and expand servicemembers' and veterans' rights and benefits. Another part of its mission is to advance the interests of its members, who pay membership dues that help fund MVA's activities.

4. MVA has a strong interest in this petition. MVA filed its challenges to the VA's December 31, 2019 revisions to the M21-1 Manual to advance the interests of veterans and its members. And this Court's review of these challenges is essential to MVA's goal of advancing the fair administration of veterans' benefits. Pre-enforcement review allows veterans and advocacy organizations like MVA to challenge unlawful VA rules long before they are applied against individual veterans in the long and arduous claim and appeals process. MVA and its Blue Water Navy Section have also previously litigated related issues in this Court, the D.C. Circuit, and the Supreme Court, and MVA is presently challenging other VA rules in at least one case pending before this Court.

5. Currently MVA has over 1200 members. Most of these members are disabled veterans

Page 1 of 2

A6

or spouses of disabled veterans.  Most have entered the VA system and a number have cases under appeal.  Our board of directors is made up completely of disabled veterans or their spouses.  See https://www.militaryveteransadvocacy.org/board-of-directors.html.  We also have several attorney members, many of whom practice veterans law assisting disabled veterans, and some of whom are veterans themselves.  MVA is subdivided into five Sections, covering veterans who served in the Blue Water Navy, Guam (and other Central Pacific Islands), Southeast Asia (to include Thailand), Panama Canal Zone and Okinawa, respectively.  These Sections review toxic exposure use in their areas of concern, maintain a library of scientific literature for each area, and provide assistance to individual members who have suffered a disease or disability connected with military service in that geographic location.  Additionally, the Sections provide information and input into MVA's rulemaking requests to the VA.

6.  Many of our members across our various sections had claims pending with the VA at the time of the petition, have claims pending now, or will potentially have future claims.  Among those members are Frederick Hinchcliffe 2nd, Leonard Brzozowski, Michael Austin, and Jay Lawrence Cole, each of whom has provided his own affidavit in connection with this petition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 15, 2021.

Respectfully Submitted,

John B. Wells
Commander USN (ret)
Chairman of the Board and Director of Litigation
Military-Veterans Advocacy



# Military-Veterans Advocacy, Inc.
### Post Office Box 5235
### Slidell, Louisiana 70469-5235
### Telephone (985) 641-1855

**Rob Maness**
Colonel USAF (Retired)
Executive Director
email: rob@robmaness.com

**Michael Yates**
Chief of Staff
email: commander@bluewaternavy.org

**John B. Wells**
Commander USN (Retired)
Chairman of the Board
Director of Litigation
email: JohnLawEsq@msn.com

**James A. Kuiken**
Sgt. Major USMC (Retired)
Vice Chairman of the Board
Director of Legislation
email: contact@JamesKuiken.com

**Michael Kvintus**
Secretary
email: ermizmo1@yahoo.com

December 7, 2020

Hon. Robert L. Wilkie
Secretary of Veterans Affairs
810 Vermont Ave. NW
Washington, DC 20420

      Re:    Extension of Blue Water Navy benefits to area surrounding
              Phu Quoc island.

Dear Mr. Secretary:

      As you know, the case of *Procopio v. Wilkie*, 913 F.3d 1371 (Fed. Cir. 2019), found that, for purposes of the Agent Orange Act of 1991, service in the territorial sea was considered to be service in the Republic of Vietnam. Later that year, Congress passed the Blue Water Navy Vietnam Veterans Act, Pub. L. 116-23, which added a separate section, § 1116A to Title 38 of the U.S. Code. *Procopio* was decided under § 1116 and was not repealed or modified by the Congressional action.

      Among the many deficiencies in Pub. L. 116-23, was the reliance on fixed geographic points to establish a baseline from which the twelve mile territorial sea was drawn. The area was designated with the ambiguous and misleading term "offshore." The VA adopted the § 1116A language and incorporated it into the M21-1 Manual. Unfortunately, while Congress actually added 360 square nautical miles of ocean, neither the Act or the M21-1 Manual, included the territorial sea around Phu Quoc island.

      Although Phu Quoc is off the west coast of Indochina and close to Cambodia, at all pertinent times it was included in the sovereign territory of the Republic of Vietnam. In fact there was a rather infamous South Vietnamese Prisoner of War camp located on the island. While not relevant to the presumptive requirements of the Agent Orange Act, there is at least some anecdotal evidence of herbicide spraying on Phu Quoc island. *See, e.g.,* http://www.vetshome.com/Agent_Orange.htm. Under the provisions of *Procopio*, the presumptive area should include the 12 mile territorial sea surrounding the island.

      Several ships, including submarines, called at Phu Quoc and apparently took on fuel, stores and water from the island. Unfortunately, submarine deck logs seldom provide the latitude and longitude of the vessel, instead referring to "Special Operations." The patrol reports, which would provide more detail, remain classified. Accordingly, I ask that you request the Joint Services Records Research Center to, upon request, review the patrol reports and confirm whether or not the vessel was within 12 nautical miles of Phu Quoc. This would also require a change to the M21-1 Manual to direct the rater to make the appropriate request when Phu Quoc becomes an issue.

A8

Hon. Robert L. Wilkie
Secretary of Veterans Affairs
December 7, 2020
-2-

Thank you for your consideration and assistance. As always, we at Military-Veterans Advocacy appreciate your efforts on behalf of veterans.

Sincerely,

John B. Wells
Commander USN (ret)
Chairman of the Board and
Director of Litigation